UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| ZACHARY KELSEY, | Case No. 3:18-cv-00174-MMD-CBC |
| Petitioner, | |
| v. | ORDER |
| RENEE BAKER, *et al.*, | |
| Respondents. | |

## I.    INTRODUCTION

This case is a *pro se* petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by Zachary Kelsey, an individual incarcerated in Nevada. The Court will deny Kelsey's habeas petition, will deny him a certificate of appealability, and will direct the Clerk of the Court to enter judgment accordingly.

## II.   BACKGROUND

Kelsey's conviction is the result of events that occurred in Washoe County on February 5, 2012. In its order affirming Kelsey's conviction, the Nevada Supreme Court described the crime, as revealed by the evidence at Kelsey's trial, as follows:

> 40 to 60 young people gathered at the Stead race track for a bonfire party. Tyler DePriest brought Jared Hyde to the party in his Dodge Durango. Towards midnight, a fight broke out between two girls. Taylor Pardick tried to break-up the fight but he was confronted by Jake Graves after he warned one of the girls that he was not afraid to hit her. Pardick did not want to fight with Graves, but several people egged the fight on.
>
> Robert Schnueringer and Andrue Jefferson were among those encouraging the fight. They identified themselves as belonging to a group called "Twisted Minds" or "TM," and they both shouted "TM" and urged Pardick to "rep for TM" by fighting Graves. When Pardick refused to fight, Jefferson reached around Graves and struck Pardick several times to get the fight started. Eric Boatman tried to intercede on Pardick's behalf, but ultimately Graves struck both of them and knocked them to the ground.
>
> After these fights, Hyde headed towards the Durango. He walked alone and said out loud, "This is bullshit. You just knocked out my best

friend." Zachary Kelsey, whose friends included Graves and Schnueringer, overheard Hyde and confronted him. Although Hyde's hands were held high, like he did not want to fight, Kelsey struck him twice in the head. Kelsey then grabbed Hyde as he fell and kneed him in the head twice. Zach Clough and Michael Opperman seized and restrained Kelsey, but Kelsey continued to yell at Hyde. Evidence was also presented that Kelsey later boasted that the last person he hit had died and that he used brass knuckles on Hyde.

When Hyde picked himself up, he had blood running from his mouth, his shirt was torn, and he looked distraught. He said to DePriest, "Let's go, let's get out of here. I just got rocked," and he continued to move towards the Durango. While Kelsey continued to yell at him, Hyde approached the passenger side of the Durango where he was confronted by Schnueringer and Jefferson. They asked him if he was "still talking smack" and he replied, "No, I'm not, I'm not." Hyde was scared, about to cry, and did not want to be there. He did not have his arms up and he was not defending himself when Schnueringer punched him in the head.

Schnueringer delivered a forceful, knockout punch that caused Hyde's knees to buckle and his body to fall to the ground. Jefferson got in front of Hyde's face, exclaimed, "You got knocked the fuck out," and then delivered a similar punch to Hyde's head. Schnueringer and Jefferson kicked Hyde as he lay on the ground, and Jefferson celebrated by jumping around and saying, "I slept him, I slept him." When Clifton Fuller checked his friend for a pulse, he felt something at first and then it went away.

Hyde was not breathing when he arrived at the hospital and efforts to resuscitate him failed. The medical examiner, Dr. Ellen Clark, conducted a forensic autopsy of the body. She determined that the manner of death was homicide and the cause of death was subarachnoid hemorrhage due to blunt force trauma. She found five separate areas of bleeding beneath the scalp surface and testified that these injuries were the result of blunt force trauma and they were consistent with being punched or kicked in the head numerous times. She also testified that the first blow to Hyde's head could have been the fatal blow, she could not identify one fatal impact site, and, in her opinion, the multiple injuries to different parts of Hyde's brain were cumulative. Dr. Clark had consulted with Dr. Bennet Omalu during the autopsy. Dr. Omalu is an expert on brain trauma and he testified that each and every one of the blows delivered to Hyde's head contributed to his death due to the phenomenon of repetitive traumatic brain injury.

(Order of Affirmance, Ex. 79 (ECF No. 19-8) at 1-3.)

On December 12, 2012, following a jury trial in Nevada's Second Judicial District Court, in Washoe County, Kelsey was found guilty of murder in the second degree. (*See* Verdict, Ex. 47 (ECF No. 18-11).) Kelsey was sentenced to a minimum of 10 years to a maximum of 25 years in prison. (*See* Judgment, Ex. 53 (ECF No. 18-17).) Kelsey appealed, and the Nevada Supreme Court affirmed the judgment on February 27, 2014. (*See* Order of Affirmance, Ex. 79 (ECF No. 19-8).) The Nevada Supreme Court denied Kelsey a rehearing on April 25, 2014. (*See* Order Denying Rehearing, Ex. 81 (ECF No.

19-10).) The Nevada Supreme Court denied Kelsey en banc reconsideration on July 31, 2014. (*See* Order Denying En Banc Reconsideration, Ex. 85 (ECF No. 19-14).)

On September 15, 2014, Kelsey filed a petition for a writ of habeas corpus in the state district court. (*See* Petition for Writ of Habeas Corpus, Ex. 87 (ECF No. 19-16).) The court appointed counsel for Kelsey, and his petition was supplemented. (*See* Recommendation and Order for Appointment of Counsel, Ex. 91 (ECF No. 19-20); Supplemental Petition for Writ of Habeas Corpus Post-Conviction, Ex. 92 (ECF No. 19-21).) The court held an evidentiary hearing. (*See* Transcript of Proceedings, Ex. 115 (ECF No. 20-9).) The court granted one ground of Kelsey's petition: trial counsel was ineffective for waiving closing argument. (*See* Order, Ex. 120 (ECF No. 20-15).) The State of Nevada appealed, and the Nevada Court of Appeals reversed the granting of Kelsey's petition regarding trial counsel's waiver of closing argument, affirmed the denial of the remaining grounds of Kelsey's petition and remanded the matter back to the state district court on February 27, 2017. (*See* Order Affirming in Part, Reversing in Part, and Remanding, Ex. 158 (ECF No. 21-17).) The Nevada Supreme Court denied Kelsey's petition for review. (*See* Order Denying Petition for Review, Ex. 167 (ECF No. 21-26).)

Kelsey then initiated this federal habeas corpus action, *pro se*, on April 24, 2018. (*See* Petition for Writ of Habeas Corpus (ECF No. 6).) Kelsey's petition asserts that his federal constitutional rights were violated due to the following alleged violations:

1.  Trial counsel failed to give a closing argument.

2.  Trial counsel failed to consult with or retain an expert regarding the probable cause of the victim's death.

3.  Trial counsel failed to interview and present the testimonies of three witnesses.

4.  Trial counsel failed to object and move for a mistrial when counsel for a co-defendant injected racist philosophies and vouched for the credibility of a witness.

5.  Trial counsel failed to move to sever the trial.

///

(*See* Petition for Writ of Habeas Corpus (ECF No. 6).) Respondents filed an answer to Kelsey's petition on September 4, 2018. (ECF No. 16.) Kelsey did not file a reply.

## III. DISCUSSION

### A. Standard of Review

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

4

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## B. Ineffective Assistance to Counsel

In Grounds 1 through 5, Kelsey claims that his federal constitutional rights were violated. (Petition for Writ of Habeas Corpus (ECF No. 6).) In Ground 1, Kelsey claims that his trial counsel, Mr. Scott Edwards, Esq. (hereinafter Edwards), was prejudicially ineffective in waiving closing arguments. (*Id.* at 19.) In Ground 2, Kelsey claims that Edwards was prejudicially ineffective in failing to consult with or retain an expert to give an exculpatory medical opinion regarding the probable cause of the victim's death. (*Id.* at 24.) In Ground 3, Kelsey claims that Edwards was prejudicially ineffective in failing to interview and present the testimonies of three witnesses in order to corroborate his testimony and impeach the testimony of an adverse witness. (*Id.* at 29.) In Ground 4, Kelsey claims that Edwards was prejudicially ineffective in failing to object and move for a mistrial when one of his co-defendant's counsel injected racist philosophies into his cross-examination of Kelsey and vouched for the credibility of a witness. (*Id.* at 33.) And, in Ground 5, Kelsey claims that Edwards was prejudicially ineffective in failing to move to sever his trial from his co-defendants' trials once his co-defendant announced his theory of the case during opening statements. (*Id.* at 37.)

These grounds were raised on the appeal in Kelsey's state habeas action. (*See* Supplemental Petition for Writ of Habeas Corpus Post-Conviction, Ex. 92 (ECF No. 19-

21).) The Nevada Court of Appeals reversed the granting of Kelsey's petition regarding Edwards's waiver of closing argument, and it affirmed the denial of the remainder of Kelsey's petition. (*See* Order Affirming in Part, Reversing in Part, and Remanding, Ex. 158 (ECF No. 21-17).) The Court finds that the ruling of the Nevada Court of Appeals was reasonable.

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. In analyzing a claim of ineffective assistance of counsel under *Strickland*, a court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other. *See id.* at 697.

### 1.     Ground 1

In Ground 1, Kelsey claims that Edwards failed to give a closing argument in violation of his federal constitutional rights. (Petition for Writ of Habeas Corpus (ECF No. 6) at 19.) Kelsey argues that Edwards could have explained to the jury that he was only guilty of misdemeanor battery or involuntary manslaughter and that his involvement in the fight was not the proximate cause of the victim's death. (*Id.*) Respondents assert that

Edwards strategically waived closing arguments and made his theory of the case clear during opening statements and during Kelsey's testimony. (Answer (ECF No. 16) at 8-9.)

On the appeal in Kelsey's state habeas action, the Nevada Court of Appeals reasoned that Edwards "testified he decided to waive closing argument because he did not believe the State's closing argument was very vigorous and believed the State's rebuttal closing argument would be much more persuasive." (Order Affirming in Part, Reversing in Part, and Remanding, Ex. 158 (ECF No. 21-17) at 2.) Accordingly, the Nevada Court of Appeals ruled that "[w]hile the choice to forgo closing argument may not have been the best option, it was a tactical decision and did not place counsel's representation 'outside the wide range of professionally competent assistance.'" (*Id.* at 3 (quoting *Strickland*, 466 U.S. at 690-91).)

Edwards waived closing argument at the trial. (Transcript of Proceedings, Ex. 49 (ECF No. 18-13) at 2045.) During the post-conviction evidentiary hearing, Edwards testified that his theory of defense was that Kelsey "was guilty at best of the lesser included offense of simple battery" and that Kelsey was not the proximate cause of the victim's death. (Transcript of Proceedings, Ex. 115 (ECF No. 20-9) at 176-77.) Edwards testified that by waiving his closing argument, he gave up the opportunity to address the jury regarding proximate causation, misdemeanor battery, and involuntary manslaughter. (*Id.* at 200.) However, Edwards testified that the decision was made because he and counsel for the two co-defendants "didn't want Mr. Hall, the number one prosecutor, to come in with an argument that made a first degree [sic] murder conviction a possibility at all." (*Id.* at 193, 197.) Edwards explained that he made the decision to waive closing argument "after Ms. Halstead's opening close" because "it wasn't the most vigorous closing argument [he] had ever seen in a prosecution." (*Id.* at 230.) Conversely, Edwards explained that he would characterize Mr. Hall's closing arguments as being more vigorous. (*Id.* at 231.) Edwards, however, did testify that Kelsey's trial was the first time he had ever waived a closing argument and that "[i]t might be the last." (*Id.* at 243.)

///

7

The state district court granted Kelsey's petition for a writ of habeas corpus regarding this ground only. (*See* Order, Ex. 120 (ECF No. 20-15).) The state district court based its decision, partly, on the fact that "Edwards failed to present [Kelsey's] theory of defense to the jury by waiving closing argument." (*Id.* at 7). Due to the allegedly distinctive roles the two co-defendants played in the victim's death as compared to the role Kelsey played, it seems sensible that Edwards would have taken the opportunity to present a closing argument in order to highlight the fact that Kelsey's actions towards the victim occurred prior in time to the, arguably, more severe beating the victim received from the co-defendants. Further, similar to his opening statement, Edwards could have asked the jury to find Kelsey guilty of involuntary manslaughter or misdemeanor battery instead of murder. (*See* Transcript of Proceedings, Ex. 37 (ECF No. 18-1) at 303 (explaining that "[t]he evidence won't show you that [the victim] met his demise at the hands of Zach Kelsey"), 304 (explaining that "Zach Kelsey was separated from [the victim] and his death. He was separated by distance, perhaps a hundred feet. He was separated in time from the actions that accused the death of [the victim]"), 305 (explaining that "[t]his is not a murder case, at least from Zach Kelsey's perspective").)

While Edwards's decision to forgo closing argument may be unexpected given the facts of the case, "[j]udicial review of a defense attorney's summation is . . . highly deferential-and doubly deferential when it is conducted through the lens of federal habeas." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003). In fact, "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id.* at 5-6 (internal citations omitted).

Edwards testified that he waived closing argument due to his belief that Mr. Hall would give a vigorous surrebutter whereby he may ask the jury to find Kelsey guilty of first-degree murder. (Transcript of Proceedings, Ex. 115 (ECF No. 20-9) at 193, 197, 231.) Similarly, defense counsel in *Bell v. Cone* had two options: he could give a closing argument and, thus, "give the lead prosecutor, who all agreed was very persuasive, the

chance to depict his client as a heartless killer just before the jurors began deliberation" or he "could prevent the lead prosecutor from arguing by waiving his own summation and relying on the jurors' familiarity with the case and his opening plea." 535 U.S. 685, 701-02 (2002). In *Bell*, it was held that "[n]either option . . . so clearly outweigh[ed] the other." *Id.* at 702. Accordingly, because Edwards's rationale for waiving closing argument was based on sound logic, his actions did not "f[a]ll below an objective standard of reasonableness," and as such, there is no need to determine whether Kelsey was prejudiced. *Strickland*, 466 U.S. at 688, 697. Thus, the Nevada Court of Appeals' ruling that Edwards's waiver of closing argument was a tactical decision (*see* Order Affirming in Part, Reversing in Part, and Remanding, Ex. 158 (ECF No. 21-17) at 3), was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Kelsey habeas corpus relief with respect to Ground 1.[1]

### 2. Ground 2

In Ground 2, Kelsey claims that Edwards failed to consult and retain a medical expert to give a contrary opinion regarding the cause of the victim's death in violation of his federal constitutional rights. (Petition for Writ of Habeas Corpus (ECF No. 6) at 24.) Kelsey explains that Amy Llewellyn, M.D. could have testified at his trial that the victim's injuries were consistent with the second attack by his co-defendants. (*Id.* at 25-26.) Respondents argue that Dr. Llewellyn's testimony at the post-conviction hearing was not definitive, as she testified that she could not rule out the possibility that Kelsey's punches attributed to the victim's death. (Answer (ECF No. 16) at 11.) Respondents also argue that counsel is not required "to shop for experts." (*Id.* at 12.)

///

---

[1]Kelsey also argues that the district court's factual findings regarding claims of ineffective assistance of counsel are entitled to deference, but the Nevada Court of Appeals failed to follow this standard. (Petition for Writ of Habeas Corpus (ECF No. 6) at 24.) While it is true that deference is given to the district court's factual findings, the district court's application of the law to those facts is reviewed de novo. *Lott v. Mueller*, 304 F.3d 918, 922 (9th Cir. 2002). Accordingly, this argument is without merit.

On the appeal in Kelsey's state habeas action, the Nevada Court of Appeals held that substantial evidence supports the district court's decision that

> Kelsey failed to demonstrate a reasonable probability of a different outcome at trial had counsel presented an expert because the expert presented at the evidentiary hearing could not establish which arteries caused the hemorrhaging in the victim's brain and her testimony could not be differentiated from that of the experts presented by the State at trial.

(Order Affirming in Part, Reversing in Part, and Remanding, Ex. 158 (ECF No. 21-17) at 4.)

Ellen Clark, M.D., the chief medical examiner and coroner for Washoe County, testified at Kelsey's trial. (Transcript of Proceedings, Ex. 37 (ECF No. 18-1) at 450-51.) Dr. Clark testified that "[t]he cause of death was bleeding into the brain specifically referred to as subarachnoid hemorrhage that is bleeding over the surfaces of the brain and the spinal cord as a consequence or due to blunt force trauma." (*Id.* at 455.) Dr. Clark explained that a single blow to the head can cause tearing of the veins and arteries that supply blood to the brain and that, potentially, additional blows to the head can exacerbate those tears. (*Id.* at 464.) Dr. Clark further explained that "there were multiple injuries to different parts of [the victim's] brain" such that she "cannot identify one fatal impact site" because "based upon the cumulative effect or the compounding injury, any and all of the blows may have contributed to causing death." (*Id.* at 475, 496.)

Bennet Omalu, M.D. testified as an expert witness for the state at Kelsey's trial. (Transcript of Proceedings, Ex. 44 (ECF No. 18-8) at 4.) Dr. Clark consulted with Dr. Omalu in order to provide his opinion regarding the victim's cause of death. (*Id.* at 15.) Dr. Omalu testified about the "phenomenon of repetitive traumatic brain injury." (*Id.* at 28.) This phenomenon provides that "each and every repeated blow accentuates the totality of all the blows" such that it cannot be determined "which blow was the fatal blow." (*Id.*) Dr. Omalu further testified that each hit to the victim cannot be isolated, so he must conclude that "each and every blow contributed to his death." (*Id.* at 29.)

///

Edwards did not call an expert witness to rebut the testimony of Dr. Clark and Dr. Omalu. (*See* Transcript of Proceedings, Ex. 115 (ECF No. 20-9) at 212 (showing that Edwards only called Kelsey as a witness).) Edwards testified at the post-conviction hearing that he "did not contact a forensic pathologist as an expert witness" in developing his theory of defense. (Transcript of Proceedings, Ex. 115 (ECF No. 20-9) at 178.) Instead, Edwards explained that he spoke to counsel for one of the co-defendants, Mr. John Ohlson, Esq. ("Ohlson") about an expert that Ohlson had contacted and that Ohlson's expert could not contradict Dr. Clark's or Dr. Omalu's findings. (*Id.* at 181.)

Dr. Llewellyn testified at Kelsey's post-conviction hearing. (Transcript of Proceedings, Ex. 115 (ECF No. 20-9) at 23.) Dr. Llewellyn testified that it is possible that Kelsey's blows to the victim's face were the cause of the victim's death (*id.* at 30-31) and that she could not determine whether the victim's brain was bleeding following Kelsey's assault on the victim (*id.* at 64-65). However, Dr. Llewellyn further testified that it is "more probable" that the disruption of the victim's blood vessels was due to the actions of Kelsey's co-defendants if the facts are that, following Kelsey's punching of the victim on two or three occasions, that Kelsey's co-defendants blindsided the victim and then repeatedly kicked him in the head. (*Id.* at 33; *see also id.* at 42-43 (testifying that "it's much more probable that most, if not all, injuries were from the second assault").)

Consistent with her testimony at trial, Dr. Clark testified at Kelsey's post-conviction hearing that she "cannot exclude the initial fight or the initial exchange of blows involving [Kelsey] today from causing severe and potentially lethal injury to the [victim's] brain." (*Id.* at 71.) Dr. Clark also consistently testified that Kelsey's blows to the victim's head could have caused tearing that was exacerbated by the subsequent attack and that Kelsey's blows to the victim's head, even if they were less severe than the blows delivered by the co-defendants, could have caused the victim's brain to bleed. (*Id.* at 72-73, 85.)

Dr. Llewelyn testified that it is "more probable" that the victim's death was caused by the assault committed by the co-defendants. This testimony differs from the testimony given at trial by Dr. Clark and Dr. Omalu, namely, that each blow delivered by the three

11

defendants contributed to the victim's death. Importantly, however, Dr. Llewelyn also testified that it is possible that Kelsey caused the victim's death. Therefore, even if Edwards's "representation fell below an objective standard of reasonableness" due to his failure to attempt to contact an expert pathologist and his reliance on the representations of a co-defendant's counsel (who was presenting a contradictory defense—that a defense expert was unobtainable), Dr. Llewelyn's admission that Kelsey possibly caused the victim's death demonstrates that there is not a reasonable probability that but for Edwards's failure to contact an expert witness, the result of Kelsey's trial would have been different. *Strickland*, 466 U.S. at 688, 694; *see also Williams v. Thaler*, 684 F.3d 597 (5th Cir. 2012) (holding that trial counsel's failure to obtain independent ballistic or forensic evidence was deficient but not prejudicial under the deferential AEDPA standard); *cf. Harrington v. Richter*, 562 U.S. 86, 111 (2011) ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense."); *cf. Dees v. Caspiri*, 904 F.2d 452, 454 (8th Cir. 1990) ("[W]e have never suggested counsel must continue looking for experts just because the one he has consulted gave an unfavorable opinion."). Accordingly, the state court's ruling that "Kelsey failed to demonstrate a reasonable probability of a different outcome at trial had counsel presented an expert" (Order Affirming in Part, Reversing in Part, and Remanding, Ex. 158 (ECF No. 21-17) at 4) was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Kelsey habeas corpus relief with respect to Ground 2.

### 3. Ground 3

In Ground 3, Kelsey claims that his federal constitutional rights were violated when Edwards failed to call three witnesses—Zach Zac Clough, Taylor Cornelison, and Stephen Laudenslager—who would have corroborated his testimony and impeached the testimony of Michael Opperman. (Petition for Writ of Habeas Corpus (ECF No. 6) at 29.)

Specifically, Kelsey argues that the testimony of these three witnesses would have proven that he did not act with implied malice and that he was not the proximate cause of the victim's death. (*Id.* at 30.) Respondents argue that these three witnesses did not disclose their knowledge of the fight between Kelsey and the victim to police officers and that they would have only provided cumulative testimony. (Answer (ECF No. 16) at 14.)

On the appeal in Kelsey's state habeas action, the Nevada Court of Appeals found no deficiency or prejudice. (Order Affirming in Part, Reversing in Part, and Remanding, Ex. 158 (ECF No. 21-17) at 4.) The Nevada Court of Appeals reasoned that the testimony of these witnesses was duplicative and that "[a]t the evidentiary hearing, evidence was adduced that these three witnesses, while they gave statements to the police, never told the police they had witnessed this particular fight at the party" so "it was reasonable for counsel not to have sought to interview these witnesses." (*Id.* at 5.)

Edwards testified at the post-conviction hearing that he had forty plus witness statements and that

> from a fair reading of what they had to say, [he] had a picture of who was going to be coming and who was going to be testifying and what they were going to say. So [he] didn't call everybody; [he] didn't interview everybody. The police had done that. [He] had no reason to believe what they had told the investigating officers was untrue.

(Transcript of Proceedings, Ex. 115 (ECF No. 20-9) at 217-18.) Edwards also testified that if one of the witnesses had said "something particularly necessary" during his or her interview with the sheriff's office, then he would have subpoenaed him or her as a witness and that if he did not subpoena a witness, it is "safe to assume that [he] evaluated [that person's] statement and didn't see anything in there that was particularly helpful." (*Id.* at 224-25.) Edwards further explained that he and Kelsey "went through the witnesses and talked about the people that were out there and what the trial would look like and who was saying what before trial" and that "sometimes it's not very useful at all to send an investigator, especially with 43 juveniles in high school." (*Id.* at 229, 240.)

///

At the post-conviction hearing, Clough, Cornelison, and Laudenslager testified that they were never interviewed by a defense investigator prior to trial. (Transcript of Proceedings, Ex. 115 (ECF No. 20-9) at 87, 107, 131.) And although Clough testified that he told a detective from the Washoe County Sheriff's Office that Kelsey and the victim were fighting, Cornelison testified that she never told the detectives that she saw the fight between Kelsey and the victim. (*Id.* at 101-02, 124.)

Clough and Cornelison both testified about the altercation between Kelsey and the victim, and both testified that Kelsey was not wearing brass knuckles. (*Id.* at 98, 114.) Although he admitted to not knowing the victim, Clough testified that Kelsey and the victim were standing and "kind of wrestling around" and had both "gotten their shirts caught up over their heads where they couldn't see anything." (*Id.* at 95, 101-02.) Clough also testified that he saw Kelsey strike the victim twice, that he never saw Kelsey "put his knee into [the victim's] body," that the altercation only lasted 20 seconds, that there was no winner of the fight, and that the victim walked away from the fight normally. (*Id.* at 97, 99.) Cornelison testified that she saw Kelsey hit the victim once and knee him on his body once, that the fight lasted "no longer than 30 seconds," and that the victim walked away from the fight normally. (*Id.* at 115-118.) Although he did not witness the fight between Kelsey and the victim, Laudenslager testified that he saw the victim walking before he was attacked by the co-defendants and that he was walking "perfectly fine." (*Id.* at 138-39.)

Interestingly, Clough's, Cornelison's, and Laudenslager's testimonies are similar to the testimony given by the state's main witness against Kelsey, Michael Opperman. During the state's direct examination, Opperman testified that Kelsey hit the victim twice in the head, and "then as [the victim] was going down, [Kelsey] grabbed his head and kneed him twice in the head." (Transcript of Proceedings, Ex. 38 (ECF No. 18-2) at 783.) However, during his cross-examination by Edwards, Opperman testified that Kelsey "started shoving [the victim] and then [Kelsey] pulled him over, didn't hit him in the head, though, he kind of just grabbed him and then he threw his right, left, right and then

grabbed his head and kneed him twice" somewhere from the neck up. (Transcript of Proceedings, Ex. 39 (ECF No. 18-3) at 938-39.) Opperman also answered in the affirmative when asked if the victim "popped right back up" after his fight with Kelsey. (*Id.* at 942.) With regard to brass knuckles, Opperman testified that he never saw Kelsey with brass knuckles the evening of the fight and that he was "not a hundred percent sure that [Kelsey] had said that he had the brass knuckles on him" that evening. (*Id.* at 906.)

Although Kelsey argues that Clough's, Cornelison's, and Laudenslager's testimonies would have impeached the testimony of Opperman, that argument is not supported by the facts in the record, as their testimonies were substantially similar. Clough testified that Kelsey hit the victim twice; Cornelison testified that Kelsey hit the victim once and kneed him in his body; and Opperman testified that Kelsey hit the victim twice and kneed him twice somewhere from his neck up. Further, Clough, Cornelison, Laudenslager, and Opperman all testified that the victim was able to walk away from his fight with Kelsey, and Clough, Cornelison, and Opperman all testified that they did not see Kelsey wearing brass knuckles the night of the fight. Accordingly, Clough's, Cornelison's, and Laudenslager's testimonies would not have been significant, and, in fact, would have been cumulative. *See United States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir. 1990) ("The Constitution does not oblige counsel to present each and every witness that is suggested to him. In fact, such tactics would be considered dilatory unless the attorney and the court believe the witness will add competent, admissible and non-cumulative testimony to the trial record."); *cf. Minner v. Kerby*, 30 F.3d 1311, 1317 (10th Cir. 1994) ("[T]he decision of what witnesses to call is a tactical one within the trial counsel's discretion."). Importantly, Clough's, Cornelison's, and Laudenslager's testimonies also do not substantially corroborate Kelsey's testimony, as Kelsey testified that he had to kick the victim off him during the altercation. (*See* Trial Transcript, Ex. 45 (ECF No. 18-9) at 1798 ("[The victim] came forward with his fists balled up. I punched him twice. He ended up grabbing my shirt. When he grabbed my shirt I tried to kick him off of me. That didn't work. I actually ended up losing my balance and I was falling over. I tried

it a second time and the same thing happened. So I ended up just leaning back and putting my weight into putting him off of me and when I did that he pulled my shirt over my head.").)

Moreover, "trial counsel [is] not bound by an inflexible constitutional command to interview every possible witness;" rather, "counsel [is] simply required to exercise reasonable professional judgment in deciding" who to interview. *Lewis v. Mazurkiewicz*, 915 F.2d 106, 113 (3d Cir. 1990); *see also Strickland*, 466 U.S. at 691 (1984) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments"). Edwards testified that he reviewed the 40 statements obtained from the police and did not seek to interview witnesses himself unless they had provided relevant information in their statements. Due to the large number of partygoers and, thus, witnesses in this case, it was reasonable for Edwards to have relied on the police statements and to have forgone unnecessary investigations into other witnesses. Accordingly, because Edwards exercised his professional judgment in deciding to only interview potentially favorable witnesses and because the additional three witnesses' testimonies were not favorable to Kelsey's defense, Edwards's actions did not "f[a]ll below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Thus, the state court's ruling on this ground was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Kelsey habeas corpus relief with respect to Ground 3.

### 4. Ground 4

In Ground 4, Kelsey claims that his federal constitutional rights were violated when Edwards failed to object and move for a mistrial when Ohlson injected racist philosophies during his cross-examination of Kelsey and vouched for the credibility of Dr. Clark.

(Petition for Writ of Habeas Corpus (ECF No. 6) at 34.) Respondents assert that it was a tactical decision by Edwards not to object to the two instances of alleged misconduct. (Answer (ECF No. 16) at 16-17.)

On the appeal in Kelsey's state habeas action, the Nevada Court of Appeals found no deficiency regarding either alleged instance of misconduct. (Order Affirming in Part, Reversing in Part, and Remanding, Ex. 158 (ECF No. 21-17) at 5.) Regarding the comments about being a member of a racist group, the Nevada Court of Appeals held that Kelsey "failed to demonstrate counsel was deficient because this was a tactical decision by counsel" and "also failed to demonstrate resulting prejudice because the jury was instructed the statements and questions of attorneys are not evidence." (*Id.*) Regarding the vouching argument, the Nevada Court of Appeals held that "Kelsey failed to demonstrate counsel was deficient or resulting prejudice" because "Kelsey failed to demonstrate this statement was vouching . . . or that it was a comment on the veracity of the witness." (*Id.* at 6.)

During his direct examination at trial, Kelsey explained that he belonged to a group known as "straight edge." (Trial Transcript, Ex. 45 (ECF No. 18-9) at 1775.) Kelsey explained that "straight edge" is "a lifestyle" where individuals do not drink alcohol, do not use drugs, and listen to hard-core punk music. (*Id.*) During his cross-examination of Kelsey, the following exchange took place:

> Q    Straight edge used to be associated with the neo-Nazis, didn't they?
> A    No.
> Q    They did, son. Did you know that?
> A    No, I didn't know that.
> Q    Part of the culture used to be fighting; did you know that?
> A    No, I didn't know that.
> Q    They used to shave their heads; did you know that?
> A    I don't have a shaved head. Does that mean I'm not straight edge?

(*Id.* at 1880, 1902.) Edwards did not object. (*See id.*) During the post-conviction hearing, Edwards was asked if he thought to object to Ohlson's discussion about neo-Nazis.

(Transcript of Proceedings, Ex. 115 (ECF No. 20-9) at 192.) Edwards testified that "[i]t crossed [his] mind. It shocked [him]. It wasn't very enduring, you know, it went on. And Mr. Kelsey was able to, you know, disabuse that notion about Straight Edge in his own testimony." (*Id.*) Edwards also testified that "[Ohlson] moved on from it from [sic] pretty quickly, and Mr. Kelsey defended himself I thought adequately. I didn't want a limiting instruction or something that would bring more attention to it than already had been." (*Id.* at 193.) Edwards also stated that he did not think that the jury believed Kelsey was a Nazi. (*Id.* at 233.)

"An attorney's failure to object to the admission of inadmissible evidence is not necessarily ineffective." *Morris v. California*, 966 F.2d 448, 456 (9th Cir. 1991) ("We need not determine the actual explanation for trial counsel's failure to object, so long as his failure to do so falls within the range of reasonable representation."). Assuming Ohlson's comments about neo-Nazis was inadmissible, it was not unreasonable for Edwards not to have objected. Because the record supports Edwards's beliefs that Ohlson moved on from the exchange quickly and that Kelsey defended himself adequately, Edwards's actions did not "f[a]ll below an objective standard of reasonableness," and as such, there is no need to determine whether Kelsey was prejudiced. *Strickland*, 466 U.S. at 688, 697. Therefore, the state court's ruling that the lack of an objection was a tactical decision by counsel was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d).

Turning to Kelsey's argument that Ohlson vouched for a witness, at the conclusion of his cross-examination of Dr. Clark, Ohlson stated, "[t]hank you, Doctor. You remain as brilliant as usual." (Transcript of Proceedings, Ex. 37 (ECF No. 18-1) at 488.) Edwards testified at the post-conviction hearing that he did not distinctly remember this comment. (Transcript of Proceedings, Ex. 115 (ECF No. 20-9) at 203.) However, Edwards explained that he did not object because "[t]hat's Mr. Ohlson's style" and he did not "consider that [Ohlson's] comment might be a form of vouching for the witness." (*Id.* at 203-04.) Edwards

18

also explained that he did not feel that Ohlson's comment prejudiced Kelsey and that it was simply "a polite ending to [Ohlson's] examination." (*Id.* at 232.)

"Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993). Several factors are assessed in determining whether there was improper vouching:

> the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall.

*Id.* at 1278. Importantly, Kelsey is not alleging improper vouching on the part of the prosecutor; rather, his contention concerns a comment made by counsel for a co-defendant. "Although . . . no lawyer, either public or private, should lay his or her own credibility on the line by expressing his or her own opinion about a witness' believability, the difference is that a private lawyer's impropriety in that respect carries no implication of official governmental support." *U.S. v. Weatherspoon*, 410 F.3d 1142, 1148 (9th Cir. 2005). Therefore, "the ethical bar is set higher for the prosecutor than for the criminal defense lawyer." *Id.*

Ohlson's comment describing Dr. Clark as "brilliant" amounts to an assertion of his personal opinion. However, this was a single statement made at the end of his cross-examination of the witness. *See United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005) (holding that a single improper statement did not materially affect the verdict). Because the degree and extent of the comment were minimal, it cannot be determined that it rises to the level of improper vouching. As Edwards testified, Ohlson's comment appears to be a polite ending to his examination. Accordingly, as there was no improper vouching, Edwards's lack of an objection did not "f[a]ll below an objective standard of

reasonableness," and there was no prejudice to Kelsey. *Strickland*, 466 U.S. at 688, 694. Thus, the state court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Kelsey habeas corpus relief with respect to Ground 4.

### 5.    Ground 5

In Ground 5, Kelsey claims that Edwards failed to move to sever the trial in violation of his federal constitutional rights. (Petition for Writ of Habeas Corpus (ECF No. 6) at 37.) Kelsey argues that his defense was mutually antagonistic from that of his co-defendants: Kelsey merely committed a misdemeanor battery against the victim while the co-defendants killed him compared to Kelsey killing the victim and the co-defendants merely battering a dead person. (*Id.* at 39.) Respondents assert that judicial policies do not favor severing trials of defendants who have been charged with committing the same crime, that the jury was not forced to choose between convicting the co-defendants or Kelsey, and that there was nothing preventing the state from presenting the same argument presented by Ohlson. (Answer (ECF No. 16) at 18-19.)

On the appeal in Kelsey's state habeas action, the Nevada Court of Appeals determined that "[w]hile we agree the defenses in this case were antagonistic, Kelsey failed to demonstrate the joint trial compromised a specific trial right or prevented the jury from making a reliable judgment regarding guilt or innocence." (Order Affirming in Part, Reversing in Part, and Remanding, Ex. 158 (ECF No. 21-17) at 6-7.)

Unlike the other attorneys involved in the trial who gave their opening statements at the commencement of the trial, Ohlson, who represented co-defendant Robert Schnueringer, gave his opening statement prior to presenting his case-in-chief. (Transcript of Proceedings, Ex. 41 (ECF No. 18-5) at 1675.) During his opening statement, it appears that Schnueringer's defense centered around attributing the victim's death to Kelsey. Ohlson discussed the fact that he asked Dr. Clark whether two of the marks on the victim "were consistent with someone hitting [him] wearing brass knuckles"

and that Opperman testified "that he encountered Zach Kelsey at the party and that he had a conversation with Zach Kelsey and that Zach Kelsey told him, 'I got a new pair of brass knuckles.'" (*Id.* at 1676-77.) He also explained that Dr. Omalu testified that the victim's injuries were not injuries that would have caused him to die immediately. (*Id.* at 1677.) Following his opening statement, Ohlson called three witnesses, Aaron Simpson, Zachary Fallen, and Zachary Smith. Simpson, Fallen, and Smith all testified that they attended a gathering where Kelsey was present. (*Id.* at 1680, 1710-11, 1725.) At the gathering, Kelsey stated that the last person he hit died and that he had used brass knuckles in that fight. (*Id.* at 1682, 1711, 1727.)

Edwards testified at the post-conviction hearing that he did not "think from [his] pretrial meetings that Mr. Ohlson was going to present a defense that would . . . put the blame solely on Mr. Kelsey." (Transcript of Proceedings, Ex. 115 (ECF No. 20-9) at 188.) However, it "somewhat" occurred to Edwards that Ohlson "was running a defense pointing the finger at Mr. Kelsey" when Ohlson presented his opening statement. (*Id.* at 189.) Edwards testified that he did not "consider moving to sever the trials . . . when Mr. Ohlson gave his opening statement" because it did not occur to him that the co-defendants were using inconsistent defenses and that a severance was necessary. (*Id.* at 191, 221; *see also id.* at 236 (testifying that he "didn't figure that [Ohlson's statement] was so antagonistic that it would warrant separate trials").)

Kelsey's argument that his trial should have been severed from his co-defendants lacks merit for several reasons. First, "there is no clearly established federal law requiring severance of criminal trials in state court even when the defendants assert mutually antagonistic defenses." *Runningeagle v. Ryan*, 686 F.3d 758, 774 (9th Cir. 2012); *see also Collins v. Runnels*, 603 F.3d 1127, 1132-33 (9th Cir. 2010) ("hold[ing] that neither *Zafiro v. United States* nor *United States v. Lane* establish a constitutional standard binding on the states requiring severance in cases where defendants present mutually antagonistic defenses"). Second, a jury instruction was given to help combat any confusion the jury may have had about the joint trial:

> The case of each defendant should be considered separately and individually. The fact that you may find one of the defendants guilty or not guilty of any of the crimes charged should not control your verdict as to any other defendant. You may give separate consideration to the evidence as to each defendant.

(Jury Instruction 39, Ex. 48 (ECF 18-12) at 42; *see also Runningeagle*, 686 F.3d at 777 ("[A]ny juror confusion was cured by the trial court's instruction.").)

And finally, in order to show that he was prejudiced, Kelsey must show that "there [was] a reasonable probability that, but for" Edwards's failure to successfully move to sever his trial, "the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. The testimony of Simpson, Fallen, and Smith may not have been presented had the trials been severed, but absent their testimony that Kelsey boasted that he killed someone while wearing brass knuckles, Kelsey could still have been found guilty of second-degree murder. Dr. Clark testified that "any and all of the blows may have contributed to causing death" (Transcript of Proceedings, Ex. 37 (ECF 18-1) at 496), and Dr. Omalu testified that "each and every blow contributed to his death" (Transcript of Proceedings, Ex. 44 (ECF 18-8) at 29). Accordingly, whether he was wearing brass knuckles or not when he hit the victim, the medical evidence was sufficient to show that Kelsey contributed to the victim's death, so there is no "reasonable probability" that Kelsey would not have been convicted if he had been tried separately. *Strickland*, 466 U.S. at 694. Therefore, because there was no prejudice, the state court's ruling on this claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Kelsey habeas corpus relief with respect to Ground 5.

## IV.    CERTIFICATE OF APPEALABILITY

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000).

Applying this standard, the Court finds that a certificate of appealability is unwarranted in this case. The Court will deny Kelsey a certificate of appealability.

**V.      CONCLUSION**

It is therefore ordered that the Petition for Writ of Habeas Corpus (ECF No. 6) is denied.

It is further ordered that Petitioner is denied a certificate of appealability.

It is further ordered that the Clerk of the Court is directed to enter judgment accordingly.

DATED THIS 22nd day of August 2019.


MIRANDA M. DU,
UNITED STATES DISTRICT JUDGE