UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ZACHARY KELSEY,

                            Petitioner,

        v.

TIM GARRETT,[1] *et al.*,

                            Respondents.

Case No. 3:18-cv-00174-MMD-CLB

ORDER

I.    **SUMMARY**

Petitioner Zachary Kelsey filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 on May 16, 2018. (ECF No. 6 ("Petition").) This Court denied the Petition and a certificate of appealability on August 2, 2019. (ECF No. 27.) Kelsey appealed on September 4, 2019, and the United States Court of Appeals for the Ninth Circuit granted a certificate of appealability with respect to the following issues: whether Kelsey's trial counsel provided ineffective assistance, including whether his counsel was ineffective for (a) waiving closing argument, or (b) failing to consult with or retain an expert regarding the victim's cause of death.[2] (ECF Nos. 29, 31.)

Kelsey moved for a remand because documents—namely, John Ohlson's deposition testimony and Amy L. Llewellyn, M.D.'s report—from the state court record were not submitted to—and thus not reviewed by—this Court when it denied the Petition. The United States Court of Appeals for the Ninth Circuit granted the motion on July 12,

---

[1]The state corrections department's inmate locator page states that Kelsey is incarcerated at Lovelock Correctional Center. Tim Garrett is the current warden for that facility. At the end of this order, this Court directs the clerk to substitute Tim Garrett as a respondent for the prior respondent Renee Baker. *See* Fed. R. Civ. P. 25(d).

[2]These issues were grounds 1 and 2, respectively, of the Petition. (ECF No. 6.)

1   2021, pursuant to *Nasby v. McDaniel*, and remanded the case for further proceedings.

2   Based on that order, this Court reopened this action.

3        Based on the foregoing, grounds 1 and 2 of the Petition are before this Court for

4   consideration of Ohlson's deposition and Dr. Llewellyn's report to determine whether this

5   Court's previous judgment should be amended. In that respect, Kelsey filed a

6   supplemental brief, respondents answered, and Kelsey replied. (ECF Nos. 44, 49, 52.)

7   This Court now affirms its previous denial of—but grants a certificate of appealability for—

8   grounds 1 and 2 of the Petition.

9   **II.   BACKGROUND**[3]

10       On February 4, 2012, a group of approximately 50 people, ranging from high

11  school students to individuals in their early 20s, were at the motocross track in Lemmon

12  Valley, Nevada having a party and bonfire. (ECF Nos. 18-1 at 73–74, 88; 18-3 at 179.) A

13  few hours into the party, two women, Amber Dutra and Kasey Sinfellow, started to fight.

14  (ECF No. 18-4 at 78.) Taylor Pardick, Dutra's boyfriend, broke up the fight, but Sinfellow

15  hit Pardick. (*Id.*) Pardick "threatened that he wasn't scared to punch a girl in the face," so

16  Jacob Graves, Sinfellow's close friend, joined the altercation, saying, "if you want to try

17  and hit a girl, then you can hit me.'" (*Id.* at 274.) Andrue Jefferson and others tried to

18  instigate a fight between Pardick and Graves, asking if Pardick "was part of the [Twisted

19  Minds] crew, and if [he] was, then [he] needed to fight." (ECF No. 18-2 at 212, 214.) Eric

20  Boatman joined the altercation to assist Pardick, but Graves hit Boatman and Pardick,

21  knocking them both to the ground. (*Id.* at 215.)

22       Michael Opperman testified that he and Kelsey were walking away from the

23  altercation involving Graves, Boatman, and Pardick when they heard Jared Hyde

24  comment, to no one in particular, "[t]his is bullshit. You just knocked out my best friend."

25  (ECF No. 18-2 at 282.) Kelsey overheard Hyde's comment and pushed him. (*Id.*) Hyde

26  ───────────────

27       [3]This Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. The summary is merely a backdrop

28  to its consideration of the issues presented in the case. Any absence of mention of a specific piece of evidence does not signify the Court overlooked it in considering Kelsey's claims.

"had his arms up kind of like . . . don't hit kind of thing," and Kelsey hit him twice in the head. (*Id.* at 283.) "And then as [Hyde] was going down, [Kelsey] grabbed his head and kneed him twice in the head." (*Id.*) Aubree Hawkinson testified that she saw Kelsey "grab[ Hyde] by the shirt and knee[ ] him in the face and hit him a couple times." (ECF No. 18-4 at 275.) Opperman testified that he grabbed Kelsey and pushed him away from Hyde. (ECF No. 18-2 at 283.) Hyde got up, "had blood either from his mouth or his nose running down, his shirt was torn," and walked away. (*Id.*) Opperman characterize the incident between Kelsey and Hyde as an attack: "[Hyde] had no way to defend himself. He was just walking, was talking to himself . . . . [Kelsey] overheard it, thought he was talking shit about him or about maybe one of his friends or something like that and kind of just went at him." (ECF No. 18-3 at 18.)

Opperman testified that he tried to calm Kelsey down because Kelsey was screaming at Hyde as he walked away. (ECF No. 18-2 at 283-84.) Cliffton Fuller testified that Kelsey was "taking off his shirt acting like he wanted to go again," and Hyde "seemed kind of out of it." (ECF No. 18-3 at 167-69.) Anthony Fuller testified that Hyde's "mouth was bleeding, [and] his shirt was ripped in half." (ECF No. 18-2 at 106.) And Brandon Naastad testified that Hyde "was scared. He was about to cry. He didn't want to be there at all." (ECF No. 18-4 at 39.)

Tyler DePriest, who drove Hyde and a few other people to the party in his Dodge Durango, testified that he saw Hyde following the incident with Kelsey, "[a]nd the collar of [Hyde's] shirt was really stretched out and ripped" and "[h]e looked kind of distraught." (ECF No. 18-2 at 11, 16.) Hyde told DePriest, "[l]et's go, let's get out of here. I just got rocked." (*Id.* at 16.) DePriest and Hyde walked back to the Durango to leave. (*Id.*) As they walked, Kelsey, who was approximately 30 feet away with his shirt off, asked Hyde, "[o]ne punch, that's it?" (*Id.* at 17.) As DePriest was getting in the driver's side door of the Durango, believing Hyde was getting in the vehicle on the passenger's side, he saw Hyde "drop." (*Id.* at 17-18.)

///

3

L.E.[4] testified that she saw Robert Schnueringer walk up to Hyde at the Durango and ask, "[s]o do you want to fight, too?" (ECF No. 18-3 at 240.) Hyde responded, "[n]o, I'm just trying to leave." (*Id.*) Schnueringer hit Hyde "[r]eally hard," and Hyde fell to the ground. (*Id.* at 240–241.) Jefferson and two other individuals then punched and kicked Hyde. (*Id.* at 241.) Naastad testified that Schnueringer and Jefferson were asking Hyde if he was "still talking smack," and after Hyde responded in the negative while "about to cry," Jefferson "hit [Hyde] and then [Hyde] kind of fell and then [Schnueringer] hit him one time and then [Jefferson] hit him two more times on the ground." (ECF No. 18-4 at 40.) Hawkinson testified that Schnueringer "punched [Hyde] about three times and [Hyde] looked pretty like [sic] he was going to pass out from the fight. And then the next thing you know, [Jefferson] jumped from behind the car and hit [Hyde] as well about three times." (*Id.* at 281.) Opperman testified that Schnueringer hit Hyde in the head with a "full-blown" punch, causing Hyde to fall, and Jefferson then told Hyde, "[y]ou got knocked the fuck out," and punched Hyde in the head. (ECF Nos. 18-2 at 284; 18-3 at 22.) Mark Rankin testified that Schnueringer asked Hyde "if he had a problem with the crew and if he wanted to get down with TM, get down with the mob." (ECF No. 18-3 at 300.) Schnueringer then "proceeded to keep yelling things about TM and he hit [Hyde]," causing him to "kind of noodle[ ] to the ground." (*Id.*) J.B. testified that Schnueringer's hit to Hyde was hard and "sounded like a baseball bat," and Schnueringer and Jefferson kicked Hyde after he fell. (ECF No. 18-4 at 195.) And Justin Ferretto testified that Schnueringer asked Hyde if he had a problem, and after Hyde said no, Schnueringer hit him, causing Hyde to fall. (*Id.* at 136.) Jefferson and Schnueringer then "started stomping on [Hyde's] head." (*Id.* at 139.)

Brett Stuber testified that after Jefferson hit Hyde, "[h]e was jumping around saying, 'I slept him, I slept him.'" (ECF No. 18-5 at 27.) Cliffton Fuller also testified that Jefferson said that he "slept" Hyde. (ECF No. 18-3 at 175.) Anthony Fuller testified that while the incident with Schnueringer and Jefferson was occurring, he "heard TM being yelled," meaning "twisted minds," which is "a tagging group." (ECF No. 18-2 at 109, 172.)

---

[4] The Court refers to minors by their initials. *See* LR IC 6-1(a)(2).

Hyde was brought to the emergency room "in essentially cardiorespiratory arrest," and efforts to resuscitate him were unsuccessful. (ECF No. 18-1 at 203.)

Schnueringer presented three witnesses at trial—Aaron Simpson, Zachary Fallen, and Zach Smith—who each testified that they saw Kelsey the night after Hyde died, and Kelsey told them that he had used brass knuckles in his fight with Hyde and that "the last person [he] hit died." (ECF No. 18-5 at 214, 243, 259.)

Kelsey testified that he was watching the fight between Graves, who was his good friend, and Pardick when three individuals, including Hyde, rushed into the fight. (ECF No. 18-9 at 36.) Kelsey "jumped between them and [Graves] and swung at the first two" individuals. (*Id.* at 37.) Hyde then said to Kelsey, "[i]f you are going to swing on me[,] I'm going to knock you out." (*Id.*) Hyde then "came forward with his fists balled up." (*Id.* at 38.) Kelsey punched Hyde twice, and Hyde grabbed Kelsey's shirt, causing Kelsey to try to kick Hyde off him. (*Id.*) In an effort to get Hyde to release his hold on Kelsey's shirt, Kelsey "ended up just leaning back and putting [his] weight into putting [Hyde] off of [him] and when [he] did that[, Hyde] pulled [his] shirt over [his] head." (*Id.*) With his shirt over his head, Kelsey "got pushed and tripped and fell into [a] tree." (*Id.*) Kelsey stood up and with his "fists balled up" asked Hyde, "[a]re you done?" (*Id.* at 39.) Hyde said he was, and then their fight was over. (*Id.*) Kelsey gave Schnueringer a ride home after the party and denied using, or bragging about using, brass knuckles. (*Id.* at 21, 50, 56-57.)

Kelsey, Schnueringer, and Jefferson were found guilty of second-degree murder. (ECF No. 18-13 at 83-84.) Kelsey was sentenced to 10 to 25 years, and Schnueringer and Jefferson were sentenced to 10 years to life. (ECF No. 18-15 at 57-58.) The Nevada Supreme Court affirmed Kelsey's judgment of conviction. (ECF No. 19-8.) Kelsey sought post-conviction relief. (ECF No. 19-16.) Although the state district court granted Kelsey's petition on the claim that his trial counsel was ineffective in failing to give a closing argument, the Nevada Court of Appeals reversed. (ECF Nos. 20-15; 21-17.)

///

///

## III.    LEGAL STANDARDS

### A.    Antiterrorism and Effective Death Penalty Act ("AEDPA")

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court

has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## B. Effective Assistance of Counsel

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104-05. In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When

a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

## IV.    DISCUSSION

### A.    Ground 1—Closing Argument

In ground 1, Kelsey argues that Edwards' decision to waive closing argument was ineffective assistance of counsel because he gave up any chance to (1) persuade the jury to select a lesser-included offense, (2) explain the jury instructions counsel prepared, and (3) distinguish Kelsey's actions from Schnueringer and Jefferson's. (ECF No. 44 at 18.)

### 1.    Information Reviewed During Initial Merits Review

The State tried Kelsey, Schnueringer, and Jefferson together. (ECF No. 17-4.) Kelsey was represented by Scott Edwards, Schnueringer by John Ohlson, and Jefferson by Richard Molezzo. (ECF No. 18 at 3.) The junior prosecutor gave the State's first closing argument, arguing that "the State [was] asking [the jury] to return a verdict for each of these three defendants" for second-degree murder. (ECF No. 18-13 at 28, 31.) A lunch break was taken following the junior prosecutor's closing argument, and following that break, Ohlson represented that "all three counsel have been discussing and we're all in unanimous agreement and each of the three defense lawyers waives closing arguments." (ECF No. 18-13 at 79.) Edwards then confirmed that he was waiving his closing argument. (*Id.*)

During the post-conviction evidentiary hearing, Edwards testified that his theory of defense was that Kelsey "was guilty at best of the lesser included offense of simple battery" and that Kelsey was not the proximate cause of the victim's death. (ECF No. 20-9 at 177-78.) Edwards testified that by waiving his closing argument, he gave up the opportunity to address his jury instructions on—and argue about—Kelsey's lack of

8

proximate cause to Hyde's death and Kelsey's actions amounting to only a misdemeanor battery or involuntary manslaughter. (*Id.* at 194-95, 200-01.) However, Edwards testified that the decision was made to waive closing argument because he, Ohlson, and Molezzo "didn't want [the senior prosecutor], the number one prosecutor, to come in with an argument that made a first degree [sic] murder conviction a possibility at all." (*Id.* at 194, 197.) Edwards explained that Ohlson "floated" the idea of waiving closing argument, and he and Molezzo "had the same kind of opinion." (*Id.* at 231.) Edwards testified that the junior prosecutor's closing argument "wasn't the most vigorous closing argument [he] had ever seen in a prosecution." (*Id.*) Conversely, Edwards explained that he would characterize the senior prosecutor's closing arguments as more vigorous; thus, the decision to waive closing argument was "predicated in part on a desire to keep [the senior prosecutor] from addressing the jury." (*Id.* at 232.) Edwards, however, did testify that Kelsey's trial was the first time he had ever waived a closing argument and that "[i]t might be the last." (*Id.* at 244.)

### 2.    New Information

In his August 2015 deposition, which this Court did not possess for consideration during its initial merits review, Ohlson confirmed that it was his idea for the three defendants to waive closing argument and that he discussed this idea with Edwards during the lunch break. (ECF No. 43-1 at 23.) Ohlson opined that the junior prosecutor's closing argument "was intentionally perfunctory in order to set us up for closing arguments to which [the senior prosecutor] could give a blazing rebuttal argument." (*Id.* at 24.) Ohlson "wanted to cut [the senior prosecutor] off from arguing" because the senior prosecutor was "[v]ery tough." (*Id.*) When asked if he would have waived closing argument had he represented Kelsey, Ohlson responded that he would not. (*Id.* at 26.) Ohlson's deposition was admitted as an exhibit at Kelsey's post-conviction evidentiary hearing. (ECF No. 20-9 at 171.)

///

///

### 3.     Legal Standard

"[C]losing argument for the defense is a basic element of the adversary factfinding process in a criminal trial," so "counsel for the defense has a right to make a closing summation to the jury." *Herring v. New York*, 422 U.S. 853, 858 (1975) (explaining that "closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions"). As such, "[t]he right to effective assistance [of counsel] extends to closing arguments," but "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003). Accordingly, "[j]udicial review of a defense attorney's summation is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas." *Id.* at 6.

### 4.     State Court Determination

In its order affirming in part, reversing in part, and remanding, the Nevada Court of Appeals held:

> The State argues the district court erred by granting the postconviction petition when it found trial counsel was ineffective for waiving respondent Zachary Kelsey's right to present a closing argument. In its order, the district court concluded counsel's decision to waive closing argument was deficient and not a tactical decision and Kelsey demonstrated prejudice because there was a possibility of a different outcome at trial had counsel presented a closing argument.
>
> We conclude the district court erred by granting Kelsey's claim that counsel was ineffective for waiving closing argument. To prove ineffective assistance of counsel, a petitioner must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*). Both components of the inquiry must be shown, *Strickland*, 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district

court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

"A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (internal quotation marks omitted). Tactical decisions of counsel "are virtually unchallengeable absent extraordinary circumstances." *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989). The decision to waive closing argument is a tactical decision. *See Bell v. Cone*, 535 U.S. 685, 701-702 (2002). An appellate court is "required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [an appellant's] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (internal quotation marks, alterations, and citations omitted).

At the evidentiary hearing, counsel testified he decided to waive closing argument because he did not believe the State's closing argument was very vigorous and believed the State's rebuttal closing argument would be much more persuasive. Counsel testified he was prepared to present a closing argument, but decided not to after hearing the State's closing argument and discussing the strategy with Kelsey's codefendants' counsels, and all defense counsel agreed to waive closing argument. He also testified he had observed the prosecutor's rebuttal closing arguments in other cases and found the prosecutor to be very vigorous and persuasive. This was a tactical decision, and cannot be challenged outside of extraordinary circumstances, which are not present here.

[FN1] The district court relied on *Ex parte Whited*, 180 So.3d 69 (Ala. 2015), to conclude Kelsey demonstrated counsel was ineffective. Trial counsel in *Whited*, however, could not articulate his strategic reason for waiving closing argument. 180 So.3d at 81-82. In the instant case, counsel articulated his reason for waiving, and therefore, the instant case is distinguishable.

While the choice to forgo closing argument may not have been the best option, it was a tactical decision and did not place counsel's representation "outside the wide range of professional competent assistance." *Strickland*, 466 U.S. at 690-91. Accordingly, we conclude the district court erred by determining counsel was deficient for waiving his closing argument.

We also conclude the district court erred by determining Kelsey suffered prejudice by counsel waiving closing argument. While the district court found Kelsey "suggest[ed] a manner in which counsel could have argued in closing that could have affected a reasonable probability of a different outcome for the Petitioner at trial," the district court also stated there were "arguments available to the Petitioner from which the jury could possibly conclude the Petitioner was guilty of the lesser charged offenses as offered in the jury instructions." Based on the evidence presented at trial, Kelsey failed to demonstrate a reasonable probability of a different outcome at trial had counsel not waived closing argument. Kelsey punched the victim in the head twice and may have kneed him the [sic] in the head as well. After being pulled out of the fight, Kelsey continued to yell and try to get at the victim. After the fight, the victim stood up, had blood streaming from his mouth, and told his friend he had been "rocked." An expert who testified at

1

2

trial stated the first blow to the victim's head may have been the death blow
and another expert testified the injuries to the victim were likely cumulative.
Accordingly, we conclude the district court erred by granting this claim.

3    (ECF No. 21-17 at 2-5.)

4         Kelsey argues that this Court should review this ground *de novo* because the

5    Nevada Court of Appeals' decision is based on an unreasonable determination of the

6    facts and an unreasonable application of *Strickland*. (ECF No. 44 at 26-27.) Specifically,

7    Kelsey argues that the Nevada Court of Appeals' finding that Edwards' decision to waive

8    closing argument was strategic is undermined by the record and the Nevada Court of

9    Appeals unreasonably gave deference to Edwards' strategy without evaluating whether

10   that strategy was reasonable. (*Id.* at 27; ECF No. 52 at 8-10.) Regarding the latter

11   argument, this Court disagrees that the Nevada Court of Appeals simply acquiesced to

12   Edwards' testimony about the strategy behind his waiver of closing argument; rather, the

13   Nevada Supreme Court determined that Edwards' decision was tactical *and* was not

14   "outside the wide range of professional competent assistance." (ECF No. 21-17 at 4

15   (citing *Strickland*, 466 U.S. at 690-91).)

16        And turning to the former argument, it is true, as Kelsey contends, that Edwards

17   testified that he waived closing argument, in part, to keep the senior prosecutor from

18   advocating that the jury should convict Kelsey of first-degree murder. (ECF No. 20-9 at

19   194.) However, this Court does not agree with Kelsey's contention that this testimony was

20   undermined by Edwards' alleged later testimony that the senior prosecutor could not have

21   made such an argument based on the facts of the case. Contrarily, Edwards testified he

22   "couldn't say . . . for sure" that the senior prosecutor would not have contradicted the

23   junior prosecutor by advocating that the jury convict Kelsey of first-degree murder

24   because "we hadn't been able to shake the causation issue." (*Id.* at 198, 202.)

25        Consequently, this Court declines to review ground 1 *de novo*.

26                              **5.    Analysis**

27        Due to the allegedly distinctive roles Schnueringer and Jefferson played in Hyde's

28   death as compared to the role Kelsey played, it seems sensible that Edwards would have

taken the opportunity to present a closing argument to highlight the fact that Kelsey's actions towards the victim occurred prior in time to the, arguably, more severe beating Hyde received from Schnueringer and Jefferson. Further, like his opening statement, Edwards could have asked the jury to find Kelsey guilty of involuntary manslaughter or misdemeanor battery instead of murder. (*See* ECF No. 18-1 at 66-68.)

However, while Edwards' decision to forgo closing argument may have been unexpected given the facts of the case, the Nevada Court of Appeals reasonably noted that Edwards testified that he waived closing argument for a tactical reason: his belief that the senior prosecutor would give a vigorous rebuttal closing whereby he *may* ask the jury to find Kelsey guilty of first-degree murder. Evaluating this tactical decision from Edwards' perspective at the time it was made and in light of the circumstances, the Nevada Court of Appeals reasonably determined that Edwards' decision fell within "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 689; s*ee also Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) ("The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances.").

Indeed, similarly, in *Bell v. Cone*, defense counsel faced two similar options: he could give a closing argument and, thus, "give the lead prosecutor, who all agreed was very persuasive, the chance to depict his client as a heartless killer just before the jurors began deliberation" or he "could prevent the lead prosecutor from arguing by waiving his own summation and relying on the jurors' familiarity with the case and his opening plea." 535 U.S. 685, 701-02 (2002). In *Bell*, the Supreme Court held that "[n]either option . . . so clearly outweigh[ed] the other that it was objectively unreasonable for the Tennessee Court of Appeals to deem counsel's choice to waive argument a tactical decision about which competent lawyers might disagree." *Id.* at 702; *see also Narvaez v. Scribner*, 551 F.App'x 416, 418 (9th Cir. 2014) ("[T]he state court correctly noted that the decision to waive closing argument was a reasonable strategic choice because the waiver denied the prosecution the opportunity to argue in response.").

1    Therefore, the Nevada Court of Appeals' determination that the state district court

2    erred by determining counsel was deficient for waiving his closing argument constituted

3    an objectively reasonable application of *Strickland*'s performance prong. *Strickland*, 466

4    U.S. at 688; *Yarborough*, 540 U.S. at 5-6; *Bell*, 535 U.S. at 701-02. This Court's previous

5    denial of ground 1 will not be amended.

6                **B.    Ground 2—Consultation and Retention of Expert**

7    In ground 2, Kelsey argues that Edwards was ineffective for failing to consult with

8    a forensic pathologist since the central issue at trial was the cause of Hyde's death. (ECF

9    No. 44 at 28.)

10                **1.    Information Reviewed During Initial Merits Review**

11    Ellen Clark, M.D., the chief medical examiner and coroner for Washoe County,

12    testified at Kelsey's trial that she performed Hyde's autopsy and that "[t]he cause of death

13    was bleeding into the brain . . . due to blunt force trauma." (ECF No. 18-1 at 213-14, 216,

14    218.) Dr. Clark explained that "a cumulative effect of the blows to the head" could have

15    resulted in death, or a single blow to the head could have caused tearing of the veins and

16    arteries that supply blood to the brain and that additional blows to the head exacerbated

17    those tears. (*Id.* at 227-28.) Dr. Clark explained that "[t]here were multiple injuries to

18    different parts of the brain" such that she could not "identify one fatal impact site" because

19    "based upon the cumulative effect or the compounding injury, any and all of the blows

20    may have contributed to causing death." (*Id.* at 238, 259.)

21    Bennet Omalu, M.D., a forensic pathologist, neuropathologist, and "recognized

22    and leading expert in brain trauma," testified that Dr. Clark consulted with him regarding

23    his opinion of Hyde's cause of death. (ECF No. 18-8 at 5, 10, 16.) Dr. Omalu testified

24    about "repetitive traumatic brain injury," meaning "each and every repeated blow

25    accentuates the totality of all the blows" such that it cannot be determined "which blow

26    was the fatal blow." (*Id.* at 29; *see also id.* at 48 ("Science cannot tell you or isolate the

27    single punch which resulted in his death."), 61 ("Each blow you receiving [sic] increases

28    the severity of injury and the risk of death.").) Dr. Omalu further testified that each hit to

14

Hyde cannot be isolated, so he must conclude that "each and every blow contributed to his death." (*Id.* at 30; *see also id.* at 67 ("The guideline of the science indicates and dictates that each and every impact to the head contributed to his eventual fatality. The more blows you receive, the greater the risk of death.").) Dr. Omalu explained that "after receiving the first injury, the first rupture, he may still be lucid, he may still be talking, but maybe symptoms will start coming up gradually." (*Id.* at 32-33.) And "[i]f he receives a second impact or force, he may drop nonresponsive almost instantaneously." (*Id.* at 33.)

Edwards did not call an expert witness to rebut Dr. Clark and Dr. Omalu's testimonies, and Edwards testified at the post-conviction hearing that he "did not contact a forensic pathologist as an expert witness." (ECF No. 20-9 at 179.) Instead, Edwards explained that he spoke to Ohlson about an expert who Ohlson had contacted and that Ohlson indicated to Edwards that his expert's opinion "wasn't good," meaning that his expert could not contradict Dr. Clark or Dr. Omalu's findings. (*Id.* at 182.) Edwards testified that he "didn't have any reason to distrust what [Ohlson] was saying to [him]." (*Id.* at 187.) Edwards also testified that he "[p]erhaps" would have been able to better cross-examine Dr. Omalu by consulting with an expert, but he "didn't feel like [he] was undermanned." (*Id.* at 249.)

Dr. Llewellyn, a pathologist, testified at Kelsey's post-conviction hearing that she reviewed Hyde's autopsy report and photographs, Dr. Clark and Dr. Omalu's trial testimonies, and various witness statements. (ECF No. 20-9 at 24, 29-30.) Dr. Llewellyn testified that it is possible that Kelsey's blows to Hyde's face caused Hyde's death, but, based on a reasonable degree of medical certainty, the second attack by Schnueringer and Jefferson were the blows that killed Hyde. (*Id.* at 31-32). Dr. Llewellyn further testified that it is "more probable" that the disruption of Hyde's blood vessels on the base of his brain was due to the actions of Schnueringer and Jefferson if the facts were that, following Kelsey's two or three punches, Schnueringer and Jefferson blindsided Hyde and then repeatedly kicked him in the head. (*Id.* at 34; *see also id.* at 43 (testifying it is "more likely than not that the injuries identified in Dr. Clark's autopsy protocol c[a]me from attacks

from the second group of assailants") and 44 (testifying that "it's much more probable that most, if not all, injuries were from the second assault").) On cross-examination, Dr. Llewellyn testified that if the facts were that Hyde were knocked to the ground or fell to his knees and was kneed in the head by Kelsey, then those would be further injuries that could possibly cause his brain to bleed. (*Id.* at 56.) Dr. Llewellyn also testified that she agreed with much of Dr. Clark and Dr. Omalu's reports; however, she did not agree with Dr. Omalu's opinion "that every single hit would have necessarily contributed to [Hyde's] death" because "not every hit is equal." (*Id.* at 60-61.)

Dr. Clark testified at Kelsey's post-conviction hearing that she "cannot exclude the initial fight or the initial exchange of blows involving [Kelsey] . . . from causing severe and potentially lethal injury to [Hyde's] brain." (ECF No. 20-9 at 69, 72.) Dr. Clark also testified that Kelsey's blows to Hyde's head could have caused tearing that was exacerbated by the subsequent attack and that Kelsey's blows to Hyde's head, even if they were less severe than the blows delivered by Schnueringer and Jefferson, could have caused Hyde's brain to bleed. (*Id.* at 73-74, 86.)

## 2.    New Information

In his August 2015 deposition, which, as stated above, the Court did not possess for consideration during its initial merits review, Ohlson testified that "it was clear that the pathology and the testimony of expert pathologists would be critical," so he consulted with Dr. Terri Haddix, a forensic pathologist. (ECF No. 43-1 at 11-12.) Dr. Haddix "identified the primary injury that was the factual cause of death of the deceased," which "was a rupture or severing of the cranial artery" from "the torquing motion of the head that resulted from a blow that the deceased received." (*Id.* at 12-13.) Ohlson "thought Dr. Haddix' information . . . would have been devastating to the prosecution [sic] . . . [b]ecause she went further than either of the State's pathologists went" in "describ[ing] the effects of a blow that was sufficient to cause the torque to the head to rupture the cranial artery." (*Id.* at 17-18.) Ohlson did not share Dr. Haddix' findings with Edwards or Molezzo because he "felt the information, while possibly exculpatory to Mr. Edwards' client, was inculpatory

16

to Mr. Molezzo's and more particularly to [his] client." (*Id.* at 14.) Ohlson only "volunteered to [Edwards and Molezzo] that [he] had consulted Terri Haddix, and that she did not have information that [he] deemed to be helpful, and [he] wasn't going to be using her." (*Id.*) As noted in ground 1, Ohlson's deposition was admitted as an exhibit at Kelsey's post-conviction evidentiary hearing. (ECF No. 20-9 at 171.)

In her January 2016 report prepared for Kelsey's postconviction proceedings, which the Court also did not possess for consideration during its initial merits review, Dr. Llewellyn reported that "[w]hile it is possible that" Kelsey's blows to Hyde "could have been fatal or contributed to the death of [Hyde], it is [her] opinion to a reasonable degree of medical probability that the blows administered by . . . Schnueringer and Jefferson[ ] were in fact fatal in nature and resulted in the death of the victim." (ECF No. 43-2 at 4-5.) Dr. Llewellyn's finding was based, in part, on her opinion that "in [the] face-to-face encounter between Kelsey and Master [sic] Hyde, it is possible but unlikely that two jabs to Hyde's cheek, which Hyde would have seen coming, would have created the motion necessary to the torquing/rotational injury (i.e., the fatal injury)." (*Id.* at 5.) Contrarily, "[t]he most significant areas injury [sic] to Jared Hyde's head and face are consistent with acts of kicking on the side of his head, possibly falling to the ground, and punching from an angle where Master [sic] Hyde would not see the assailant." (*Id.*) Dr. Llewellyn concluded that she could not "agree with the opinion that each and every blow contributed to Master [sic] Hyde's death" because "the more reasonable cause of the rotational forces causing disruption of Master [sic] Hyde's blood vessels, which caused his death, came from the second fight as opposed to the first one (involving Kelsey)." (*Id.* at 6.) Notably, Dr. Llewellyn's report was not admitted as an exhibit at Kelsey's post-conviction evidentiary hearing. (ECF 20-9 at 29.)

### 3.    State Court Determination

In its order affirming in part, reversing in part, and remanding, the Nevada Court of Appeals held:

> First, Kelsey claims the district court erred by denying his claim counsel was
> ineffective for failing to consult with and present an expert at trial to provide

17

> a contrary and exculpatory opinion regarding the probable cause of the victim's death. After holding an evidentiary hearing, the district court concluded Kelsey failed to demonstrate a reasonable probability of a different outcome at trial had counsel presented an expert because the expert presented at the evidentiary hearing could not establish which arteries caused the hemorrhaging in the victim's brain and her testimony could not be differentiated from that of the experts presented by the State at trial. Substantial evidence supports the decision of the district court, and we conclude the district court did not err in denying this claim.

(ECF No. 21-17 at 5.)

Kelsey argues that the Nevada Court of Appeals' decision is based on an unreasonable determination of the facts, making this Court's review *de novo*, because Dr. Llewellyn's testimony at the post-conviction evidentiary hearing could be differentiated from the experts presented by the State at trial. (ECF No. 44 at 32-33.) Dr. Llewelyn testified that she did not agree with Dr. Omalu's opinion that every hit Hyde suffered necessarily contributed to his death. (*See* ECF No. 20-9 at 60-61.) However, Dr. Llewelyn also testified that it was possible that Kelsey caused Hyde's death, which is consistent with Dr. Clark and Dr. Omalu's testimonies. (*Id.* at 31-32.) Accordingly, this Court disagrees that the Nevada Court of Appeals' decision was based on an unreasonable determination of the facts and declines to review ground 1 *de novo*.[5]

### 4.     Analysis

Dr. Llewellyn's testimony that it was more probable that the disruption of Hyde's blood vessels was due to the actions of Schnueringer and Jefferson was based on Kelsey's self-serving version of the facts: that he only punched Hyde whereas Schnueringer and Jefferson blindsided Hyde and then repeatedly kicked him in the head. Importantly, during cross-examination, Dr. Llewellyn's opinion as to the role Kelsey played in Hyde's death changed based on the State's version of the facts: that Kelsey punched and kneed Hyde in the head, causing him to be knocked to the ground.

At the trial, there were three individuals who testified about Kelsey's attack on Hyde: Opperman, Hawkinson, and Kelsey. Opperman testified that Kelsey hit Hyde twice

---

[5]And even if this Court were to review ground 2 *de novo*, Kelsey would still not be entitled to relief because he fails to demonstrate prejudice as discussed below.

in the head, and as Hyde "was going down," Kelsey "grabbed his head and kneed him twice in the head." (ECF No. 18-2 at 283.) And Hawkinson testified that she saw Kelsey "grab[ Hyde] by the shirt and knee[ ] him in the face and hit him a couple times." (ECF No. 18-4 at 275.) Contrarily, Kelsey testified that he only punched Hyde twice after Hyde "came forward with his fists balled up" and only *tried* to kick Hyde because Hyde had grabbed his shirt. (ECF No. 18-9 at 38.)

Based on (1) the evidence presented at the trial, which demonstrates that Dr. Llewelyn's testimony would have only been helpful if the jury believed Kelsey's testimony over Opperman and Hawkinson's testimonies; and (2) Dr. Llewelyn's testimony that—notwithstanding Schnueringer and Jefferson's actions—it was possible that Kelsey caused Hyde's death, which did not directly challenge the conclusions made by Dr. Clark and Dr. Omalu, Kelsey establishes nothing more than a theoretical possibility—not a reasonable probability—that the result of his trial would have been different had Edwards' retained an expert like Dr. Llewellyn. *See Strickland*, 466 U.S. at 694; *see also Richter*, 562 U.S. at 112 ("It was also reasonable to find Richter had not established prejudice given that he offered no evidence directly challenging other conclusions reached by the prosecution's experts."); *Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation."). As such, the Nevada Court of Appeals' determination that substantial evidence supports the state district court's decision that Kelsey failed to demonstrate a reasonable probability of a different outcome at trial had counsel presented an expert constituted an objectively reasonable application of *Strickland*'s prejudice prong. *See Strickland*, 466 U.S. at 694. The Court's previous denial of ground 2 will not be amended.

## V.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Kelsey. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). This Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65

1   (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the

2   petitioner "has made a substantial showing of the denial of a constitutional right." With

3   respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable

4   jurists would find the district court's assessment of the constitutional claims debatable or

5   wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S.

6   880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists

7   could debate (1) whether the petition states a valid claim of the denial of a constitutional

8   right and (2) whether this Court's procedural ruling was correct. *See id.*

9       Applying these standards, the Court finds that a certificate of appealability is

10  warranted for grounds 1 and 2. First, reasonable jurists could debate whether Edwards'

11  decision to waive closing argument amounted to ineffective assistance of counsel

12  because (1) he gave up the opportunity to argue for a lesser-included offense by

13  highlighting the distinctive role that Kelsey played in Hyde's death as compared to

14  Schnueringer and Jefferson, and (2) his tactical decision, at least in part, to keep the

15  senior prosecutor from advocating for first-degree murder is somewhat illogical given that

16  the junior prosecutor only advocated for second-degree murder. And second, reasonable

17  jurists could debate whether prejudice ensued from Edwards' failure[6] to consult with a

18  forensic pathologist.

19  ///

20  ///

21  ///

22

23      [6]It is fairly irrefutable that Edwards' "representation fell below an objective standard
24  of reasonableness" due to (1) his failure to attempt to contact an expert pathologist since
    the central issue at trial was the cause of Hyde's death, and (2) his misguided reliance on
25  Ohlson's representation that a defense expert was unobtainable. *See Strickland*, 466 U.S.
    at 691 (explaining that defense counsel has a "duty to make reasonable investigations or
26  to make a reasonable decision that makes particular investigations unnecessary");
    *Richter*, 562 U.S. at 106 ("Criminal cases will arise where the only reasonable and
27  available defense strategy requires consultation with experts or introduction of expert
    evidence."); *Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008) ("[W]hen the
28  prosecutor's expert witness testifies about pivotal evidence or directly contradicts the
    defense theory, defense counsel's failure to present expert testimony on that matter may
    constitute deficient performance.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VI.   CONCLUSION**[7]

It is therefore ordered that the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 6) remains denied.

It is further ordered that a certificate of appealability is granted for grounds 1 and 2.

The Clerk of Court is directed to substitute Tim Garrett for respondent Renee Baker. The Clerk of Court shall not amend the judgment previously entered on August 22, 2019. The Clerk of Court is directed to close this case.

DATED THIS 29th Day of March 2022.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

---

[7]This Court previously denied grounds 3, 4, and 5 of the Petition in its original merits order on August 22, 2019. (*See* ECF No. 27.) Because (1) the Ninth Circuit did not grant a certificate of appealability as to grounds 3, 4, and 5; and (2) the basis of the Ninth Circuit's remand—the consideration of Ohlson's deposition testimony and Dr. Llewellyn's report—do not particularly concern grounds 3, 4, and 5, this Court does not reconsider them. (*See* ECF No. 43-1 at 26-27 (Ohlson's deposition discussing, briefly, his cross-examination of Kelsey, which tangentially corresponds with ground 4, Edwards' failure to object to Ohlson's racist philosophies).) As such, they remain denied as provided in this Court's original merits order. (ECF No. 27.)